316-0759, Tegel, D.C., Illinois, I believe, by Leah Benton v. Daniel Ramsey, upon by Tiffany Boyd-Greene. Thank you, Ms. Greene. Good afternoon. Good afternoon. I did want to ask Your Honors about our motion to cite additional authority, which we filed in May, May 23rd. We have not received a ruling on that. It was to cite the most recent decision in house as well as the Illinois Supreme Court decision in buffer. So I wanted to check with Your Honors before I refer to those cases in my argument. I think that maybe go ahead and... Was there an objection filed? There was not. No objections. Why don't you go ahead? We'll make a formal ruling with the decision, but you can assume for right now that it's okay. Okay, thank you. May it please the Court, my name is Tiffany Boyd-Greene, and I represent Daniel Ramsey in this matter. Daniel Ramsey's amended post-conviction petition made a substantial showing that his life sentence without the possibility of parole violates the Illinois Constitution. His sentence was imposed on March 9th, 2011 by former Governor Quinn when he commuted all the life sentences or all the death sentences in Illinois to life at the same time that he abolished the death penalty. This executively imposed sentence did not take into account any individual factors in sentencing Mr. Ramsey. It did not consider his youth, any mitigating factors specific to him, or the possibility for rehabilitation. What required him to do that? Well, the holding in Miller by the United States Supreme Court says that when you are imposing a life sentence without any discretion, that that sentence is unconstitutional as it applies to... and rehabilitation. So in the Illinois Appellate Court, the First District took that holding in Miller and applied it to a young offender who was over the age of 18, finding that there was no bright-line rule at which the court could say somebody had reached maturity. So, it's under Miller as well as House that we are asserting this argument, that he should have been able to consider the individual factors. What do you do with the case law that says that nobody can require the governor to take anything into consideration when he's granting clemency? Well, I don't interpret the case law as saying that a governor's authority is without limitation when he's imposing or issuing a clemency order. He needs to follow the law, and he can't impose an unconstitutional sentence. We know from MATA that in that case, the defendant challenged the life sentence that had been imposed by the former Governor Ryan. And in that case, the state also argued that the governor's authority is unchecked, but that's not the case. The Illinois Supreme Court said that due process is superior to a governor's clemency power. So, he is obligated to follow the law and impose a sentence that is constitutional. And it's our position that in this case, Mr. Ramsey's sentence is unconstitutional under the Proportionate Penalties Clause as it applies to him. Life without parole is for the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible, and life without parole is justified. That's from Miller. Additionally, House, quoting Graham, has said that a life sentence without the possibility of parole is for individuals who will never be fit to reenter society. And that is not the case with Mr. Ramsey. He had turned 18 just three months before these offenses occurred. So, if this had taken place three months earlier, he would be entitled to a new sentencing hearing under Miller. And when you look at the facts of this case, mitigation that's relevant to Mr. Ramsey, the fact that he had been diagnosed with Asperger's Syndrome or on the autism spectrum, he had ADHD, he had borderline personality disorder, he had been a social outcast as a child, he had a dysfunctional family life, and now he believed that his mother, he believed that his, he found out that his sister was actually his biological mother, and that the people he believed were his parents were actually his biological grandparents. And those parents repeatedly refused him access to counseling that the school and other counselors said would help Mr. Ramsey with his deficiencies. Additionally, the crimes here were the product of extreme emotional distress, which we know from the language in-house, which looks at recent studies in neurobiology and psychology, that an individual's brain does not stop developing until the mid-20s, and the part of the brain that is developing at that time is that which controls impulsivity and recklessness, heedless risk-taking, and also makes a young offender more volatile in emotionally charged situations. And that was the case here. And additionally, under the Proportionate Penalties Clause, we do have to look at whether or not there is evidence that Mr. Ramsey could be rehabilitated. And there is evidence in this record that he absolutely could be. When he was young and placed in different juvenile facilities, he would break the rules, he would act out. However, now as he's matured in the Illinois Department of Corrections, he has followed every rule and has had only one minor infraction for leaving a toiletry accidentally in the shower. And that's the kind of evidence that Montgomery says we can look at to see if an individual will change from a troubled youth to somebody who can successfully reenter society. And we cannot ignore that evidence. And we want to remind the Court that over the past few years, we've seen this evolving standard of decency when it comes to sentencing young offenders. The statutes have changed so that the Miller factors, as they've been known now, are codified and must be considered when sentencing an individual under 18. The trial courts now have discretion whether or not to impose the firearm enhancement. And most recently, there has been a parole statute enacted for offenders under 21. So young adults who commit murder after serving 20 years of their sentence are eligible for parole. And that statute demonstrates the changes that courts and the legislature are applying when it comes to sentencing these young offenders. Daniel Ranzi requests the benefit of these evolving standards at a new sentencing hearing, at which time the Court can consider the current science regarding the development of a juvenile brain, as well as the multiple factors in mitigation and his potential for rehabilitation. I have a question. Was there a sentencing hearing ever? There was a sentencing hearing in 2007 that was at the death penalty, after he pled guilty. And at that hearing, the jury had the choice between life or death. There was never a time for a lower sentence. Right, but there was never any kind of a hearing before Quinn. There was not. There was not. There were no lemency petitions filed at the time of those commutations. It was just a blanket commutation for all sentences of death at the time. You're only focusing on the sentence for murder, correct? That is correct, though I do know that there are the other sentences and the other offenses of 60 years. So let's say if we reduced, if we agreed with you and we sent it back for a sentencing hearing on a murder, wouldn't an aggregate term of 60 years still stand because you haven't challenged those? Well, we would now challenge that under buffer. That's going to be my question. 60 years is probably natural life as well. Absolutely. But you could have amended your brief, filed supplemental briefs, and you have not done so. No, we have not done so, but we did want to cite to buffer to show that the proper remedy in this case would be a new sentencing hearing. And at that time, the parties could examine the sentence for all of the offenses. Only if we remand for the parties to look at all the other sentences. Correct, correct. At least that requested in your initial brief. No, and I think at this point the proper remedy would be for him to file a successive, if you do not remand for another sentencing hearing, the appropriate remedy would be for him to file a successive PC, raising a buffer-type issue, which was not available at the time he filed his post-conviction petition. Thank you for answering my question. Okay. Thank you very much. Any other questions? Thank you. Ms. Bennett, good afternoon. Good afternoon. Thank you, Your Honors. May it please the Court. Counsel, my name is Leah Bendick from the Illinois Attorney General's Office on behalf of the people of the state of Illinois. This court should affirm the judgment of the Hancock County Circuit Court, which dismissed Petitioner's post-conviction petition at the second stage because Petitioner's natural life sentence for several crimes committed as an 18-year-old does not violate the Eighth Amendment of the federal constitution or the state constitution. It appears my opponent, in not arguing the Eighth Amendment here today, has conceded that the very recent case of People v. Harris from the Illinois Supreme Court shows that the Eighth Amendment claim fails. After all, Mr. Harris, like Petitioner, was 18 when he committed his offenses, and the Illinois Supreme Court held that the Miller Eighth Amendment rule does not extend to 18-year-olds. And so it appears I won't address that claim any further unless there are any questions and will instead turn to the state constitutional challenge. The standard for state constitutional purposes is whether the sentence imposed is, quote, cruel, degrading, or so wholly disproportionate to the offenses as to shock the moral sense of the community. The Circuit Court here listed the several offenses in ultimately rejecting this claim on the merits. The court noted that Petitioner had raped his 16-year-old friend, L.M. He taped her head from her eyebrows to her chin so that she could not breathe. He fatally shot her and dumped her in a grain bin. He then went to a gas station, called the Sloop household to tell a lie and lure the adults from the household. He approached the house then with wire cutters to cut the telephone lines, armed with a gun. When he entered without authority, he spoke to his 17-year-old ex-girlfriend, and not happy with the results of the conversation, he shot her in the head, although she survived. Her 12-year-old sister was asleep on the couch at the time, and he shot her in the head and killed her. He then went upstairs and encountered two toddlers and shot both of them in the head or neck. He shot 3-year-old Cody in the neck, damaging his esophagus and his nerves, and he shot 2-year-old Courtney in the head, destroying her eye. It's remarkable that of these five victims that were shot in the head or neck, that only two of them were killed. He is the sole principal offender. He has never disputed that he was the offender. He pled guilty for his crimes. And yes, he went through a very detailed and extensive capital sentencing hearing. At that sentencing hearing, he was given the opportunity to develop and offer mitigating evidence, including through psychiatrists. As my opponent acknowledged, this was 2007, which was after the key U.S. Supreme Court case of Roper, which was the first in the line of cases in the Roper, Graham, and Miller line that first highlighted this brain science evidence and juvenile development and rehabilitation and maturity. Despite that, he didn't offer any evidence of specifically his personal brain development, but did put forth extensive evidence about his mental disorders, about his family background, about his limited prior criminal history. In my opponent's brief, she points out that this evidence is just the sort of evidence that Miller cited should be considered by the sentencer. And in fact, that was considered by a jury here in Illinois during the capital sentencing hearing. And when given the choice between a capital sentence and a natural life sentence, when comparing all of that mitigating evidence against the facts of these crimes, the jury chose to impose a death sentence. Now, of course, as I just said, we no longer are really looking at the Eighth Amendment claim, but it's relevant to note that when Montgomery v. Louisiana explained Miller and said that it's important for the sentencer to consider youth and attendant circumstances to determine before imposing a life sentence whether the offender was acting with permanent incorrigibility, a rare offender, or was simply acting under transient immaturity. I would suggest that the fact that the jury chose to impose a death sentence after hearing the extensive mitigating evidence that Petitioner is now relying on was making exactly that same finding in choosing to impose a death sentence. That is a message saying, we do not believe that this offender can be rehabilitated. As a result, he did have the opportunity to present this evidence. There is no reason for this court to be troubled about the fact that this petition was dismissed at the second stage. He has had that opportunity to present this mitigating evidence, and given that the standard for state constitutional purposes is whether the moral sense of the community is shocked by the sentences imposed in light of the offenses, the fact that that jury, that's 12 members of the community that heard this evidence and chose to impose a death sentence, which is a good indication that the fact that he now stands under a life sentence does not shock the moral sense of the community. And as Your Honor pointed out, it is now true that he is under an executive sentence rather than a judicially imposed sentence. That adds an extra layer of difficulty for Petitioner to get any relief for his arguments today because under the case law after the several commutations Governor Ryan imposed in the early 2000s, the Illinois Supreme Court made clear that virtually all sentencing challenges are rendered moot by executive commutation. Now, my opponent cites Mata, but Mata is distinguishable. Mata, it's important to note the factual situation in Mata. There, Mata was challenging her death eligibility. She said, I should not have even been found death eligible. And the court decided that that specific claim was not moot because if it were valid, she would have faced a maximum 60-year sentence, which would have been less than even the life sentence that she received through commutation. That is why that claim was still viable. That is not the situation we have here. It is not. Instead, Petitioner is now challenging both what the governor thought about in deciding to impose clemency or to grant clemency and the specific length of his current sentence. That is exactly the sort of thing under this case law that is not subject to judicial review because it is an executively imposed sentence. So turning back then, though, to the merits, not only do we know that the moral sense of the community would not be shocked by the sentences here in light of the crimes committed, we do have the handful of cases that provide the interpretation of the state constitutional analysis. It's important to note that the Illinois Supreme Court has only provided two decisions in this area of the law. There is, of course, Leon Miller, which is a 2002 case, so it preceded Miller v. Alabama. And there, the court struck down a natural life sentence as violating the state constitution, but the facts were very different than what we have here. Leon Miller was a 15-year-old. He was convicted under an accountability theory. He was not armed, and he had only moments to decide to agree to act as a lookout for other co-defendants. He never went to the actual crime scene. He never fired a weapon. And so under these circumstances, the court found that his mandatory life sentence was disproportionate. The other time the Illinois Supreme Court has spoken is the case of Adolfo Davis. Now, Davis is after Miller v. Alabama. It's important to note that Davis was 14 at the time of his offenses and was similarly convicted under an accountability theory. Davis had raised a state constitutional challenge to his mandatory life sentence before Miller v. Alabama, which was rejected by the appellate court, noting that Davis had more culpability than Leon Miller. The appellate court cited the fact that he had been armed, that he had participated in the planning of the crime, and he had actually gone to the crime scene, although he was not a shooter. This alone was enough additional culpability for the life sentence to be upheld under the state constitution. And he was a 14-year-old, so he was a juvenile at the time. That's the only time the Illinois Supreme Court has spoken. And if anything, that shows, because in Davis the court said, Miller v. Alabama, that doesn't change anything. In Leon Miller, we already were giving special consideration to juvenile, to youth in attendance circumstances, and so affirmed the rejection of the claim on race judicatograms. So what that shows is the Illinois Supreme Court has not said that there's some sort of absolute bar on a juvenile receiving an actual life sentence, even when convicted under an accountability theory. So what do we have here? We have an adult offender. We have an adult offender who was the principal, the sole shooter, who shot five victims, two of whom died. So compare this case instead to a trio of cases from the first district, Pittman, Thomas, and Ibarra. In all three cases, the court essentially said, we are not giving you relief under Leon Miller because all three of these young adult offenders were the principal. So again, that is a key factor here that is also present in this case. Now, of course, my opponent now is citing House. House is another decision from the first district involving a 19-year-old, but he was convicted under an accountability theory. Now, I don't say it's perhaps not absolute that that is the line. Are you a principal? Are you an accomplice? But even so, it's certainly an important factor, and House is importantly distinguishable on that ground. We do know in People v.—or I should say, we should compare House to a case from this court. The one time the third district has spoken in this area is the case of People v. McKee, and that was a case involving an 18-year-old accomplice whose natural life sentence was upheld under a state constitutional challenge. And in that case, the defendant, McKee, had had a very tough background. She was a crime victim herself. She had mental disorders, so she had mitigating evidence to cite, and she was an accomplice. But this court noted that because she had participated in the planning of the crime, because she had helped in the concealment of the crime afterwards, and because she was aware that murder was a possible consequence of the robbery that was being planned, that that was enough culpability to justify the natural life sentence that she got through an accountability theory. So again, compare those facts to what we have here. We do not have an accomplice. We have the shooter, a principal's sole actor who shot five victims. And yes, he had some mitigating evidence, but that trio of cases I cited before, Pittman, Thomas, and Ibarra, in those cases, mitigating evidence was cited as well. But this factor of being the principal, the shooter, is one that is a heavy, importantly weighted factor in deciding whether under the state constitution that the life sentence can stand. So to the extent, it's arguable that McKee and House are irreconcilable, perhaps, because they both involve accomplices with some mitigating evidence who are adult but young adult offenders. So to the extent they're irreconcilable, well, we're here in the third district. And under McKee, it would be appropriate and consistent with McKee to affirm the circuit court's judgment here and to uphold the sentence. A final point I'd like to make is about the legislature. My opponent cited the recent parole statute. I wanted to point out that there's a specific provision in that statute. It's section 5-4.5-110B, I believe is the citation. But the point of it is that although there's a possibility of juvenile offenders seeking parole, it exempts those who are subject to natural life sentences due to multiple murders. So that is what we have here. We have a multiple murder case, and the General Assembly, even in granting not only juveniles but those up to age 21 the potential of seeking parole, they decided not to extend that new avenue for those who were convicted of multiple murder, which is what we have in this case. Also, as we know, while there were multiple amendments made to juvenile sentencing in the wake of Miller v. Alabama, we know, for example, that a juvenile convicted of multiple murder is no longer subject to mandatory natural life. They can receive a 40-year sentence. But the General Assembly, when making that amendment, did not change the rule that if you're 18 or older and you're convicted of multiple murder, that you are subject to natural life. So again, because Petitioner is an 18-year-old, that's another way in which the General Assembly has spoken in this area. And finally, as to buffer, I wanted to address Your Honor's question. It's important to note, again, this line at 18. It is an important line, and we know that from the Harris case. Harris from the Illinois Supreme Court said for eight amendment purposes, the line is at the age of 18. The Illinois Supreme Court acknowledged that this Miller v. Alabama line of cases acknowledged this brain science evidence and that there is, you know, evolving maturity that happens in juvenile brains at this stage of their life. But it acknowledged that this line of 18 isn't based principally on this brain science, but is instead based on societal judgment for many purposes, that the difference between juveniles and adults under the law is at age 18. And because of the fact that the Illinois Supreme Court has not extended the Miller Eighth Amendment principle to 18-year-olds, buffer wouldn't apply here because, again, Petitioner was 18 years old. And that really, because of that buffer, is of very little help to this present case. Thank you. Let's see. And I think with that, I would just, again, emphasize that for the state constitutional purposes, this court should look to the McKee case, Pittman, Thomas, and Ybarra, that stress the importance of whether the offender was an accomplice versus a principal. Keep in mind what the circuit court judge emphasized here, the very seriousness of the crimes, compared to some of this handful of cases in the state constitutional area. And hold that it's appropriate to affirm Petitioner's natural life sentence, whether on the merits or because it's not subject to judicial review because it's an executively imposed sentence. So unless there are any further questions. Yes, sure, please. The offenses were committed in 1996. And I think you did mention the aggravated sexual assault, that the first victim who was shot before that, she was sexually assaulted. That's true. That's true. So in 1996 he was 18, but in 2007 he was 29. When he was sentenced in 2007, the jury is not looking at a youthful offender. Does that influence your argument at all? Well, I think they still were pointing out during the sentencing hearing his situation. I mean, his family background, his personal circumstances, were certainly part of what was discussed at the capital sentencing hearing. So perhaps Ramsey, as he sat there at the table, was no longer 18 years old, but they certainly discussed the fact that he was young at the time. So I would say that he was given ample opportunity post-Roper to know that he could have— it was up to him to decide how much to emphasize that as a mitigating circumstance. Really the point is that he had the opportunity to emphasize that and to develop that as much as he wanted in mitigation. So if the sentencing had occurred in 1996, Roper wasn't decided at that point in time? That's true. That's true. But it is important to note here, and also it's important to note that House, the first opinion from the first district in House came out in 2015 and cited this brain science evidence, which is before Petitioner filed his amended post-conviction petition in March of 2016. You answered my question. Thank you very much. I can answer your question. Early in your argument, you talked about the Mata case being distinguishable because they were arguing that she was not eligible for the death penalty. In this case, I know that in the motion, you know, he filed two withdrawals, pleaded guilty to the sentence, and upon denial then or affirming of his sentence in direct appeal, he filed a post-conviction petition. The initial one, was it ever heard? I mean, the commutation happens sometime in there, but I'm not clear from the recent record if that had been heard or if he raised the death penalty issue at all. In his pro se filing, you're saying? Right. To be honest, my memory of it, and I have to admit I haven't looked at it very recently, was that it was somewhat of a pro se placeholder post-conviction petition where he knew it was going to be amended. Because he was under death sentence at the time, he would have automatically advanced to second stage and knew he was going to get counsel who would have filed a counseled amended post-conviction petition. So the key for his pro se filing was to just the timeliness of it, to get it on file so that counsel could be appointed and could file the amended petition. And so in the period between the pro se filing and the amended petition filed in 2016, we were just waiting for the amended petition. So the pro se petition wasn't heard because it had been already advanced automatically to second stage because he had at least between October of 2010 and March 2011 when he was commuted, he was under the death sentence. And so that's the time at which he advanced to the second stage automatically under the Post-Conviction Hearing Act, which allows at that time capital sentences to automatically advance. So I don't know if that answers your question. As much as I can, I guess. I'm afraid. And perhaps my opponent would know a little more about the contents of the pro se petition as well. Thank you. Thank you. Ms. Green, are you available? I agree with counsel that the pro se petition was really more just of a placeholder and that the first actual petition was the amended petition that had any substance in it. But I do want to briefly address counsel's argument. We have not abandoned our Eighth Amendment claim. As we say in our reply brief, we are maintaining that his sentence violates the Eighth Amendment, but we understand and recognize the holding in Harris and that we are obligated by that right now. But we are maintaining and preserving that argument. I'm just focusing today on the proportionate penalties argument. The facts of this case, which counsel detailed, are undeniably tragic. The crimes were fueled by extreme emotional distress. And at the time, Mr. Ramsey was so distraught that he actually did intend to kill himself. There's evidence in the record that he had sent letters or written letters that were never sent to his ex-girlfriend that he was going to kill himself, and he did shoot himself in the head at the time of the offense as well. With respect to the capital sentencing hearing, I just want to reiterate that that was in 2007. And yes, it was after Roper, but it was before this entire evolving standard of decency has really become something that the courts are looking at differently. And that jury, it wouldn't have benefited him anyway. That jury only had the choice between death and life. And really what we're looking at now is his life sentence because that's the sentence which stands. And I do want to remind the court that it's not just the facts of the offense. That's one factor in deciding whether or not a sentence is unconstitutional under the proportionate penalties challenge. There's no magic formula for when a case becomes unconstitutional because of the principal versus the accomplice or any of that. We just need to look at each individual case as it comes, and that's why it's an as-applied challenge. And in this case, he had numerous mitigating factors in addition to the fact that he's capable of rehabilitation. And really that's the piece here that the other cases counsel cited don't have. Pittman, Thomas, Shabara, McKee from this court, none of those cases show any evidence of rehabilitation. And here we have the benefit of knowing from the time he filed his amended post-conviction petition that he does have some evidence showing under Montgomery that he could be rehabilitated and reenter society. Counsel mentioned Davis. I do want to point out that that argument was rejected on a res judicata basis, and that distinguishes it from Mr. Ramsey's case because he has not raised a proportionate penalties challenge before. Harris, which counsel also mentioned, speaks to the viability, I believe, of a proportionate penalties claim for an adult who was the principal offender or a young adult. In that case, I believe he was 19. And the Illinois Supreme Court did not rule on the merits of the claim on the basis that it was undeveloped, and they said that he could file that in a post-conviction petition. If the Illinois Supreme Court wanted to preclude a proportionate penalties challenge in the event of an offender who was over the age of 18 and who was the principal, it could have done so at that point. Instead, it said that claim was more appropriate for a post-conviction petition. And that just reiterates that a court really has to look at the facts of each case before deciding whether or not a sentence is unconstitutional. I'm sorry, which case was that? That was Harris. Okay, thank you. Counsel is correct that the parole statute does exempt multiple murderers from consideration for parole, but that was something that the court and House also looked at in deciding that our evolving standard of decency when sentencing young offenders is changing. So even though House himself was not able to receive the benefit of that statute, it was still relevant to the claim. And unless Your Honors have other questions, I would just ask for another sentencing hearing. Can you state your position based on Harris that it should or could, a person acting as the offender, not an accomplice, should or could file a post-conviction petition including an infamily challenge? Could you please state your position on that? My position on that is that in that case, they did find that Miller was not applicable because in that case, Harris was over the age of 18. But they did say that a proportionate penalties claim was viable in a post-conviction petition, and they rejected that on the basis that it was premature. There was nothing in the circuit court on which the court could base a decision one way or the other, and the court suggested another filing. And this is an as-applied challenge? This is an as-applied challenge, yes. Our brief raises both for Mr. Ramsey, but in light of Harris, we are focusing on the proportionate penalties as-applied challenge. Okay. Thank you. All right. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.